## Marple Township v. Tarquinio

*John R. Graham*, for plaintiff.

*Arnold M. Snyder*, for defendant.

ERVIN, P. J., August 17, 1951.—This is a bill in equity filed by Marple Township, a second class township, to prevent the operation of a quarry, alleging that such operation was a violation of its zoning ordinance. The defense was two-fold, first, that the ground had been used as a quarry for 25 years and was therefore a nonconforming use and, secondly, that the zoning ordinance is unconstitutional as affecting defendants' land.

In the first place, it should be pointed out that there is no specific prohibition against quarries in the zoning ordinance. If they are to be excluded, it is only because they are not listed as uses which are permitted.

There is very little dispute as to the testimony. Defendants' land consists of about five and one-half acres, undeveloped and without any buildings. It is bounded by State Road on the south, by a small residence and cemetery on the west, by four other stone quarries on the north and by land partly used as a nursery on the east. The four quarries adjoining on the north are between 600 and 1000 feet distant from defendants' quarry and have been opened and operated since 1924, 1925, 1937 and 1941 respectively. Defendants' quarry was a building stone quarry rather than a crushed stone quarry. It was first opened in 1924 by one Guiliana, by whom it was conducted as a quarry until 1929, when he lost it because of the depression. In 1931 it was acquired at sheriff's sale by one DiFrancesco, who held it until his death, following which it was held by Havertown Development Company, from whom defendants purchased it in September 1947. In 1935, 1937 and 1938 it was operated by known individuals. In 1939 some unknown men were observed taking stone out by hand. In 1942 some unknown men were observed working therein. In 1943 it was operated for about three months by one Cianhetti. Because of United States governmental regulations throughout the war years, building operations were so seriously curtailed that there was a resulting lack of demand for building stone and a great many quarries throughout Delaware County ceased operating and many others were obliged to operate on a very small scale from 1943 to 1946, although crushed stone quarries were able to continue. Defendants' quarry was not operated from the fall of 1943 until November 1947,

but the owners of the quarry never intended to abandon the quarry as such. In November 1947 defendants started cleaning operations, employing 8 to 10 men for about a month, and in March 1948 they resumed the cleaning operations. In June 1948 they started to remove stone, when they were stopped by the township authorities and the present action commenced.

Defendants contend that the quarry has been operated continuously since 1924, with the exception of the period of the 1929 depression and the period of economic necessity during the recent war. They contend that such discontinuance was merely temporary and that they have a right to operate as a nonconforming use.

On the other hand, the township points to the following language in its zoning ordinance of 1938, as amended in 1944, respecting nonconforming uses:

"The lawful use of land existing at the effective date of this ordinance except as otherwise provided in this section, may be continued, although such use does not conform with the provisions of this Ordinance, but no such use shall be extended, enlarged, or changed to any use but a conforming use. If a non-conforming use of land ceases for any length of time for any reason, any subsequent use of such land shall be in conformity with the provisions of this Ordinance."

We notice that the language of this ordinance says: "If a non-conforming use of land ceases." A similar phrase, "if such use is discontinued," was considered in Haller Baking Company's Appeal, 295 Pa. 257, where the court said:

"The word 'discontinued' here, to have any legal effect, must be the equivalent of 'abandonment,' and, in Corr v. Philadelphia, 212 Pa. 123, where an owner sought to enforce an abandonment of land against a railroad, we held, 'An abandonment of land appro-

priated by a municipality for public use cannot be established by proof merely of a failure for the time to use it, or of a temporary use of it not inconsistent with an intention to use it for the purpose for which it was taken, or another public purpose.' This stable had been used continuously until 1924. Since then the quantity diminished very materially, but it was still used for its original purpose, and it is appellant's purpose and effort to continue the use. This does not show an intention to abandon, nor would the fact that on the day of the adoption of the ordinance, or a number of days before no horses were in the building. A property right, such as is involved in this case, having attached, cannot be lost by that circumstance."

We can see no difference between the meaning of the word "ceases" in the ordinance in question and the word "discontinued" in the Haller case. Under the testimony there was no doubt but that the quarry was operated in 1935, 1937, 1938 and 1943. There was also testimony that in 1939 and in 1942 some unknown men were observed taking stones out by hand. In E. Miller et al. v. Chester Slate Co., 129 Pa. 81, it was held that the words "working the quarry" mean the working of the pit and the doing of any work necessary for the proper and convenient use of the pit, such as the removal of earth, debris, water, ice or snow, would be working the quarry as truly as the blasting and removal of the slate. We, therefore, feel that the quarry was continuously operated since 1924 with the exception of two periods of economic necessity, and hold that the temporary lack of use because of economic necessity without any intention to use the land for another but inconsistent purpose does not amount to a ceasing of the nonconforming use and that defendants are entitled to continue such use.

Having so held, it would be unnecessary to pass upon the second question, namely, that zoning may not be

employed to prevent an owner from taking from his lands minerals and other products thereof. However, since there are other cases pending before this court raising the same question, we will also dispose of it so far as the facts of this case are concerned.

In 62 Corpus Juris Secundum 460 it is stated:

"As a general rule, a municipality may have the power to adopt reasonable zoning regulations restricting the use of land apart from buildings or other structures thereon, and in this connection it has been held that, even though a constitutional provision authorizing the establishment of building zones does not refer to vacant land, a municipality may have the power to regulate the use of such land in particular districts under authority derived from state statutes. The validity of zoning regulations in their application to particular lands where, if valid, they would have the effect of preventing the removal of some natural product from the land must be determined with respect to their reasonableness under the circumstances. It has been held that a regulation classifying a certain district as residential may properly exclude the use of land apart from structures for the purpose of excavation operations in clay beds, removal of loam, or drilling a water well; and a regulation may forbid the use of land in a certain district for a public or private dump. It has been held, on the other hand, that zoning may not be employed to prevent an owner from taking earth products from his land, although, if a sand pit or quarry is in a residential district, he may be prevented from treating the product in that place. Also, a regulation forbidding excavating operations in a residence district has been held unreasonable and void."

A still more detailed statement is found in 58 Am. Jur. 997 et seq. Reference is also made to an annotation in 40 A. L. R. 788, superseded in 168 A. L. R.

1188. The latter annotation is quite comprehensive and deals first with regulations in general as distinguished from zoning. Such regulations are almost universally sustained where they pass the test of reasonableness. Commencing on page 1198 the annotation discusses the cases dealing with zoning rather than regulation as such. Many cases are cited in other jurisdictions and a split of authority is shown. However, the general rule stated by the annotator is found at page 1199, as follows:

"The statement of the rule, or rather formula, believed to be at once most comprehensive and exact, is found in Pittsfield v. Oleksak, (1943) 313 Mass. 553, 47 NE2d 930, wherein the court said: 'Whether the impact of a zoning ordinance upon the particular use which a landowner desires to make of his land is a reasonable and permissible interference with his rights as owner in the exercise of the police power for the public benefit or is an arbitrary, unreasonable, and oppressive, and therefore forbidden, deprivation of private property without compensation often depends upon the peculiar circumstances of the particular instance. . . . It may be said that in such cases law and fact march together. The correct decision is to be found in the answer to the question whether the particular interference that causes injury to the individual can reasonably be thought to have some tendency to advance the interests of the public, either in the direct consequences, or indirectly by upholding the integrity of a system that as a whole may reasonably be thought to promote the interests of the public. . . . And of course all presumptions are to be indulged in favor of the validity of the ordinance in its application to all instances falling within its terms.' "

No zoning cases are cited from Pennsylvania and we have found none which decide the present question. It was raised in the case of Mutual Supply Company

Appeal, 366 Pa. 424. In that case the property owner applied to the township authorities for a building permit authorizing the construction of a tipple and accessory buildings for the purpose of opening the surface of its land in order to remove coal located thereunder. The permit was refused because of the provisions of the zoning ordinance. Appellants contended that forbidding them the right to mine their coal through the surface deprived them of property without due process of law in violation of both Federal and State Constitutions. The Supreme Court stated that if appellants' major premise were well founded, the question they raised would indeed be a very serious one but held that since there was another opening into the mining operation from an adjoining township, appellants were not completely deprived of their right to mine and remove the coal. The Supreme Court did not indicate how it would decide the serious question which otherwise might have been presented.

In the absence of any specific case we can only look to the general rules which have been established relating to the validity of zoning ordinances in general. It was held in White's Appeal, 287 Pa. 259, that under the fourteenth amendment property cannot be taken except by due process of law. Regulation, under a proper exercise of the police power, is due process, even though property in whole or in part is taken or destroyed. The conditions on which its legitimate exercise is predicated should actually exist or their happening be so likely that restraint is necessary, similar to a court issuing a restraining order for injuries done or threatened to persons or property. Likewise, there should be a reasonable and substantial relation between the thing acted on and the end to be attained, one that promotes health, safety or general welfare, necessary to the common good, and a reasonable demand for regulation, not one that is merely an unneces-

sary experimentation or interference with the fundamental rights of the individual. After holding that zoning ordinances may in a general sense be a reasonable exertion of the police power, the court goes on to hold that, while the ordinance as to its general structure may be valid, it must, in specific application to any of its various phases, be tested by the principles discussed previously. The court further said:

" 'To secure their property was one of the great ends for which men entered society. The right to acquire and own property, and to deal with it and use it as the owner chooses so long as the use harms nobody, is a natural right. It does not owe its origin to constitutions. It existed before them. It is a part of the citizen's natural liberty,—an expression of his freedom,—guaranteed as inviolate by every American bill of rights.' "

White's Appeal has been cited and followed in numerous decisions, including Lord Appeal, 368 Pa. 121. Applying the test to the facts of the present case, we feel that a construction of the ordinance which would absolutely deprive defendants of their right to remove stone from this particular tract of land could not meet the test of constitutionality. Four other quarries are operating within 1,000 feet of defendants' property and the land is particularly adaptable for this use. No concentration of residential development has approached this immediate neighborhood and therefore the district involved is a sparsely settled one. There was no attempt to show that the operation of a quarry would affect the health, safety, morals or general welfare of the community. In fact, a resident of one property which is located between two of the neighboring quarries testified: "They don't do me no damage." As the court said in White's Appeal, supra: "Each case must of course be decided on its own facts," and, therefore, we cannot lay down any rule which

will govern all quarries or mines. It might very well be perfectly reasonable to prohibit quarries in a highly developed residential neighborhood but under the facts of the case before us, we must hold that such a prohibition in this case is unconstitutional. Therefore, for both this reason and the reason that defendants are properly exercising a nonconforming use, plaintiff's bill must be dismissed.